## IN THE COURT OF APPEALS OF IOWA

No. 15-1643
Filed May 11, 2016

**KELSIE STIENEKE,**
      Plaintiff-Appellee,

**vs.**

**BEAUX SARGENT,**
      Defendant-Appellant.
_____

Appeal from the Iowa District Court for Cherokee County, Patrick M. Carr, Judge.

Father appeals award of primary physical care of child to mother. **AFFIRMED.**

Zachary S. Hindman of Mayne, Arneson, Hindman, Hisey & Daane, Sioux City, for appellant.

John P. Loughlin of Loughlin Law Firm, Cherokee, for appellee.

Considered by Tabor, P.J., and Bower and McDonald, JJ.

**MCDONALD, Judge.**

Beaux Sargent and Kelsie Stieneke are the never-married parents of W.S. In October 2013, Stieneke filed her petition to establish paternity, custody, and support with respect to W.S. The district court awarded the parties joint legal custody of W.S., awarded physical care to Stieneke, awarded Sargent regular and liberal visitation, and ordered Sargent to pay $2000 in attorney fees. Sargent appeals the physical care determination, requesting he be awarded physical care of the child or, in the alternative, shared physical care. He also requests remand for recalculation of child support in the event he prevails on his claim regarding physical care of the child. Sargent also challenges the attorney fee award. We affirm the judgment of the district court.

Our review is de novo. *See* Iowa R. App P. 6.907; *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). We review the entire record and decide anew the factual and legal issues presented. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). Prior cases have little precedential value; the court must make its determination based on the facts and circumstances of each case. *See In re Marriage of Kleist*, 538 N.W.2d 273, 276 (Iowa 1995); *In re Marriage of Snowden*, No. 14–1920, 2015 WL 4233449, at *1 (Iowa Ct. App. July 9, 2015) ("All happy families are alike; each unhappy family is unhappy in its own way." (quoting Leo Tolstoy, *Anna Karenina* 1 (1873))). "[W]e give considerable weight to the sound judgment of the trial court who has had the benefit of hearing and observing the parties firsthand." *Kleist*, 538 N.W.2d at 278.

The criteria used in making the physical care determination are the same for married and unmarried parents. *See Lambert*, 418 N.W.2d at 42. Physical

care is defined as "the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." Iowa Code § 598.1(7) (2013). In making the physical care determination, we look to the factors set forth in Iowa Code section 598.41(3) and our case law. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696–700 (Iowa 2007); *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). "Each factor, however, does not necessarily impact the decision with equal force." *In re Marriage of Daniels*, 568 N.W.2d 51, 54 (Iowa Ct. App. 1997). In considering the factors, our ultimate objective "is to place the child in the environment most likely to bring him to healthy mental, physical, and social maturity." *McKee v. Dicus*, 785 N.W.2d 733, 737 (Iowa Ct. App. 2010). The controlling consideration is the best interests of the child. *See id.* at 736. Our court will "ultimately decide[ ] by determining under the whole record which parent can minister more effectively to the long-range best interests of the children." *Winter*, 223 N.W.2d at 166 (citation omitted).

The parties met at a county fair when Stieneke was fifteen years old and Sargent was twenty-four. At the time the parties met, Stieneke's father was incarcerated, and Stieneke's mother was unable to care for Stieneke. Stieneke lived with her grandmother, who was then or would later become Stieneke's legal guardian. The parties' relationship quickly became intimate. While there was some opposition to the relationship, the opposition was ineffective. Stieneke and Sargent moved in together before she graduated high school in January 2010. She studied for a career as a nurse at a local community college. He worked in a family trucking business.

The parties' relationship was marked by allegations of infidelity and domestic abuse. On one occasion in the summer of 2010, during an argument about alleged infidelity on the part of Sargent, Sargent bit Stieneke on the cheek. Later in the same summer, Stieneke accused Sargent of infidelity at a class reunion. Sargent struck Stieneke in the mouth. He testified he did so because she was holding a knife to her throat and threatening to kill herself and he intended to distract her to get the knife out of her hand. She testified that there was no knife and that Sargent had wrapped a telephone cord around her neck. Photographs of her neck showed reddening and abrasions.

Nonetheless, the parties continued on together for a short period of time. W.S. was born in June 2011. Stieneke continued her education, becoming an LPN in May 2011 and RN in May 2012. Sargent attended anger management sessions. The parties separated in May 2012. From May to September 2012, the child was in Stieneke's primary care. The parties had a "family meeting" around September 2012 intended to clear the air with their family members and help them proceed as a family unit. Sargent, at the meeting and in a contemporaneous letter, admitted to most of the domestic abuse above-described. The parties were not able to proceed in their relationship and separated for good. This action was filed in October 2013.

Sargent requests physical care of the child or, in the alternative, joint care. "In considering whether to award joint physical care where there are two suitable parents, stability and continuity of caregiving have traditionally been primary factors." *Hansen*, 733 N.W.2d at 696. The child was born in 2011 when the parties were living together. During this time, Sargent was gone frequently for

his job. The parties implemented a shared care arrangement informally in September 2012. Sargent argues the child spent more time with him in this shared care arrangement because Stieneke frequently let the child spend more time with Sargent rather than taking him to a day care.

The continuity of caregiving in this case militates in favor of the parties continuing their informal shared-care arrangement. However, under the circumstances, we conclude continuation of the arrangement is largely impracticable. The parties live in rural Iowa some distance from each other and in different school districts. The child is entering school and must have a primary residence within one of the districts without requiring the child to spend a great deal of time traveling. As the child continues to age, the distance from the school district becomes more important with respect to the ability to participate in extra-curricular activities and social activities with a regular peer group. *See In re Marriage of Hunt*, 476 N.W.2d 99, 103 (Iowa Ct. App. 1991). We thus address "which parent can minister more effectively to the long-range best interests of the children." *Winter*, 223 N.W.2d at 166.

The parties contest which school district could provide the best educational opportunity for W.S. Sargent argues the River Valley district is superior to the Cherokee district. In addition, both parties graduated from River Valley. Both parties have family near the River Valley schools, which could come into play in the event of emergency. W.S. would also know classmates in River Valley due to existing family connections. While the educational future of the child is important, the evidence regarding the quality of the schools is in equipoise and thus of little weight. *See In re Marriage of Hoffman*, 867 N.W.2d

26, 35 (Iowa 2015) (assigning little weight to this factor where "the difference, if any, between the quality of the two schools is not material").

Sargent argues he will better encourage a relationship between W.S. and both sides of the child's extended family. This is an appropriate factor to consider in custody cases. *See In re Marriage of Burkle*, 525 N.W.2d 439, 442 (Iowa Ct. App. 1994). Testimony supported the fact that W.S. has frequent contact with both families. Sargent maintains a relationship with Stieneke's mother, but Stieneke does not maintain a relationship with Sargent's family. Stieneke says she will encourage appropriate contact with extended family members, but she has concerns with Sargent's father using marijuana around the child. This is a legitimate concern. In any event, there is no evidence establishing Stieneke would not promote the relationship between W.S. and his extended family. This factor is also in equipoise.

Sargent next contends that his job is more flexible and could better accommodate the child's needs. Sargent is employed as a truck driver in a family business. He can adjust his schedule as needed. Stieneke works three twelve-hour shifts per week as a nurse. She also testified she could change her schedule to accommodate the child's needs. We conclude this factor does not favor either party.

The parties also raise several other factors, none of which favor either party over the other in any material sense, and we need not consider them in full herein.

Like the district court, we place weight on the history of domestic violence between the parties. *See In re Marriage of Daniels*, 568 N.W.2d 51, 54 (Iowa Ct.

App. 1997). Domestic abuse adversely reflects on the abusing partner's ability to be the primary caretaker of a child. *See In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994). Domestic abuse is, in every respect, dramatically opposed to a child's best interest. *In re Marriage of Barry*, 588 N.W.2d 711, 713 (Iowa Ct. App. 1998). There are serious consequences for children who grow up in a home plagued by abuse. *Daniels*, 568 N.W.2d at 55. Abuse, therefore, reveals "a serious character flaw in the batterer, and an equally serious flaw in parenting." *Id.* A "finding by the court that a history of domestic abuse exists, as specified in subsection 3, paragraph 'j', which is not rebutted, shall outweigh consideration of any other factor specified in subsection 3 in the determination of the awarding of custody under this subsection." Iowa Code § 598.41(2)(c). In interpreting what is sufficient to constitute a "history of domestic abuse," the supreme court has held a "history" is not necessarily established by a single documented incident. *See In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997). Nor does more than one minor incident automatically establish a "history of domestic abuse." *Id.* Although evidence of domestic abuse creates a rebuttable presumption against an award of joint custody, *see In re Marriage of Ford*, 563 N.W.2d 629, 632 (Iowa 1997), it is for the court to weigh the evidence of domestic abuse, its nature, severity, repetition, and to whom directed, not just to be a counter of numbers. *Forbes*, 570 N.W.2d at 760.

In this case, Stieneke testified to several incidents of domestic abuse. Sargent argues Stieneke's claims of violence are overstated and, in any event, he has addressed any such issues. The court concluded it would have been inclined to view the domestic violence as episodic and in the past but for

Sargent's repeated attempts, and his witnesses' attempts, to minimize the abuse and cast Stieneke as the bad actor. The minimization of the violence manifests a disregard for the law Sargent first evinced by his decision to commence a relationship with a high school student almost ten years his junior. *See In re Marriage of Worthington*, 504 N.W.2d 147, 150 (Iowa Ct. App. 1993) (considering party's disregard for the law in determining custody). While our review is de novo, we do give weight to the findings of the district court, particularly on issues of credibility. *See In re Marriage of Butterfield*, 500 N.W.2d 95, 99 (Iowa Ct. App. 1993). Implicit in the district court's award of primary physical care to Stieneke was a finding she was the more credible party. Our review supports that conclusion.

Sargent contends the district court abused its discretion in awarding Stieneke attorney's fees. This Court reviews an award of trial attorney fees for abuse of discretion. *See In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). A district court abuses its discretion when the court exercises its discretion on grounds that are clearly untenable or to an extent clearly unreasonable. *See Bindel v. Larrington*, 543 N.W.2d 912, 914 (Iowa Ct. App. 1995).

An award of attorney fees is not a matter of right, but rather rests within the discretion of the district court. *In re Marriage of Hocker*, 752 N.W.2d 447, 451 (Iowa Ct. App. 2008). An award of attorney fees is based upon the respective abilities of the parties to pay the fees and whether the fees are fair and reasonable. *In re Marriage of Applegate*, 567 N.W.2d 671, 675 (Iowa Ct. App.

1997). In the decree, the district court explained its reason for granting Stieneke's request for trial attorney fees:

> After considering the age of the parties, their earning capacity, and the Respondent's net worth as compared with that of the Petitioner, the Court thinks that the Respondent should contribute to the Petitioner's attorney fees in the sum of $2,000.00.

The district court considered several factors in awarding fees. None of the factors were inappropriate. We find no abuse of discretion.

Stieneke requests an award of appellate attorney fees. Such a decision rests within our discretion. *In re Marriage of Kurtt*, 561 N.W.2d 385, 389 (Iowa Ct. App. 1997). In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal. *Id.* After considering the relevant factors, we decline to award appellate attorney fees in this case.

**AFFIRMED.**